**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**DAVID WESLEY JOHNSON,**

        **Plaintiff,**

**-vs-**                                **Case No. 6:04-cv-949-Orl-KRS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL**
**SECURITY,**

        **Defendant.**

_____

## ORDER

This matter came before the Court for consideration without oral argument on the complaint filed by David Wesley Johnson seeking review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for social security disability benefits. Doc. No. 1. The Commissioner answered the complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration ("SSA"). Doc. No. 9. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and Middle District of Florida Local Rule 6.05 for adjudication. Doc. Nos. 11, 12.

**I.   PROCEDURAL HISTORY.**

On August 30, 2001, Johnson applied for disability benefits under the Supplemental Security Income for Aged, Blind, and Disabled program ("SSI"), 42 U.S.C. § 1381 *et seq.*, alleging a disability onset date of March 31, 2001. TR. 47-50. The SSA denied Johnson's application both

initially and on reconsideration. TR. 27-30, 35-37, 39-40. Then, Johnson made a timely request for a hearing. TR. 34.

An Administrative Law Judge ("ALJ") held a hearing on December 2, 2003. TR. 154. Johnson, who was accompanied by his attorney, testified at the hearing. TR. 154-70. In addition, a vocational expert ("VE") testified regarding the existence of jobs in the national economy that Johnson could perform. TR. 170-75.

The ALJ found that Johnson had not engaged in substantial gainful activity since March 30, 2001, the alleged onset date of his disability. TR. 18. The ALJ concluded that Johnson had coronary artery disease, status post myocardial infarction and stent placements, right leg pain syndrome, and complaints of left knee pain with full range of motion. These combination of impairments were severe but did not meet or equal an impairment listed in the SSA's regulations. TR. 15, 18.

The ALJ found that Johnson had the residual functional capacity ("RFC") to lift or carry up to ten pounds occasionally, sit for up to six hours in an eight-hour workday, and walk or stand for two hours per day. TR. 16. In addition, the ALJ found that, due to fatigue and his knee and leg pain, Johnson would have to discontinue walking or standing after thirty-five to forty minutes. TR. 16. He would also have to interrupt sitting after ninety minutes, to stand and stretch to relieve discomfort. TR. 16. He concluded that Johnson would be limited to sedentary work. TR. 16. TR. 21. In reaching this conclusion, the ALJ found that Johnson's subjective allegations about the extent to which his impairments limited his ability to perform work were not entirely credible. TR. 16.

The ALJ found that Johnson could not return to his past relevant work. TR. 16. Based on the testimony of the VE, the ALJ concluded that Johnson could perform work available in the national economy. TR. 17. Accordingly, the ALJ found that Johnson was not disabled. TR. 17.

Johnson requested review of the ALJ's decision. TR. 6. On April 23, 2004, the Appeals Council found no basis for changing the ALJ's decision. TR. 3-5. Johnson timely sought review of this decision by the United States District Court. Doc. No. 1.

**II.   JURISDICTION.**

The Commissioner issued a final decision after a hearing with respect to Johnson's application for disability benefits under SSI. Therefore, the Court has jurisdiction of this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

**III.   STATEMENT OF FACTS.**

A.   *Johnson's Testimony.*

Johnson was born on May 10, 1959. TR. 158. He completed school through the ninth grade. TR. 159. He is five feet ten inches tall and weighed 160 pounds at the time of his hearing, but weighed 135 pounds after his heart attack. TR. 159.

Johnson previously worked as a mechanic. TR. 159. He did everything involved in automotive repair, including engine rebuilds, tune-ups, brake jobs, water pumps, and timing belts. TR. 159-60. In performing work as a mechanic, the heaviest weight he would lift was approximately 140 to 150 pounds. TR. 160.

Johnson has two stents in his heart, which were placed there to hold a valve open. TR. 169. He had chest pain all the time. TR. 167. He took medications for his heart, including

"blood thinners" and nitroglycerin to relieve his chest pain.  TR. 164.  He took nitroglycerin three or four times per week.  TR. 167.  He had been advised to avoid stress.  TR. 70.  He did not have enough money to have continuing medical treatment for his heart condition.  TR. 55.

At some point quite a while before his hearing, Johnson had surgery on his left knee to remove cartilage.  TR. 164, 168.  His knee had gotten progressively worse every year.  TR. 168.

Johnson opined that he could only sit in one position for forty minutes and that he could only stand for up to ten minutes due to back and leg pain.  TR. 165.  Johnson further opined that he could lift approximately ten pounds.  TR. 166.  Johnson had good days and bad days, with four or five bad days per week.  TR. 167-68.  On good days he could go in the yard or go to the mailbox, but on bad days he would remain in bed because of pain and fatigue.  TR. 167.  He tried to walk for exercise, but he could not walk further than one-half of a block because he became very tired and his knee hurt.  TR. 161, 165. A physician attempted to administer a stress test, which involved Johnson's walking on a treadmill for three minutes, but the doctor terminated the test after one minute because Johnson's heart rate was too high.  TR. 169.

Johnson lived in a house with his mother.  On a typical day Johnson would arise at 6:30 a.m.  TR. 161.  Most of the time he would lie in his room or watch television.  He was a very nervous person and could not sit still for long periods of time. He socialized with his brother when his brother came over for dinner.  Johnson also had another friend who would come over to see him approximately once every two weeks.  TR. 163.  Johnson loved to fish, but he seldom could find anyone with whom to fish.  TR. 162.  Otherwise, Johnson did not have "much energy to do

anything." TR. 164. He was awakened from his sleep three or four times per week because of back or knee pain. TR. 169.

Johnson had not had a driver's license since 1981. Before he became disabled he commuted on bicycle. He traveled to his hearing by bus. TR. 162.

B.   *Vocational Expert Testimony.*

The ALJ asked the VE to assume a person of Johnson's age and education who could stand for two hours a day but the standing would have to be limited to thirty-five to forty minutes at a time with an opportunity to sit within the two hour period. The person could sit for six hours a day but would need the opportunity to get up and stretch every ninety minutes to two hours. TR. 171. The VE testified that a person with this functional capacity could perform the work of surveillance system monitor or food and beverage order clerk. TR. 172.

Johnson's attorney asked the VE the following question:

> Assume that the Claimant had an acute anterior wall, myocardial infarction and he had 90 to 95 percent stenosis of the left anterior descending, which required two [stents]. That thereafter he was seen by the state agency doctor . . . and EKG changes were suggestive of ischemic heart disease post [stent] and the Claimant has good and bad days because of fatigue and out of a week he has four to five bad days and two to three good days. If he was unable to show up for a job four to five days a week because of fatigue, would that affect your opinion?

TR. 173. The VE responded that such a person could not perform any jobs available in the national economy. TR. 174.

C.     *Medical Evidence.*

On March 31, 2001, Bhupendra P. Patel, M.D., and Oscar D. West, M.D., examined Johnson based on complaints of severe chest pain radiating down his left arm. TR. 92-96. An EKG revealed that had suffered a myocardial infarction. TR. 92-96, 98-99. A March 31, 2001, x-ray revealed atherosclerotic changes of the thoracic aorta and degenerative arthritic changes of the dorsal spine. TR. 97.

On April 6, 2001, Johnson underwent a stent placement operation. TR. 104-19. The operation was successful. TR. 106. After he was discharged from the hospital, Johnson was instructed to follow-up with Dr. West for stress testing in four weeks. TR. 112.

On February 21, 2002, Jack E. Pulwers, M.D., examined Johnson at the request of the Florida Office of Disability Determinations. TR. 120-25. Johnson reported that he had developed weakness and numbness in his right leg especially at the ankle, but that this condition had recently improved. However, he was still falling frequently. He also had daily chest pain, which lasted between fifteen and sixty minutes. TR. 120. Dr. Pulwers noted a systolic murmur in Johnson's heart and a slightly irregular heartbeat. TR. 121. Upon examination, he found full range of motion in the upper and lower extremities, but severe crepitus with bending of Johnson's left knee. Dr. Pulwers also noted decreased sensitivity to light touch in the right leg. TR. 122. Johnson's gait was normal. TR. 122. Dr. Pulwers impressions regarding Johnson included the following: coronary artery disease (CAD); right leg parasthesias and weakness; aortic stenosis murmur; mitrial regurgitation murmur; and, history of left knee surgery. TR. 122.

On July 22, 2002, Sam Ranganathan, M.D., examined Johnson at the request of the SSA. He administered an exercise stress test. TR. 134-45. Dr. Ranganathan noted that the test was stopped after two and a half minutes because of right leg pain and fatigue. Johnson did not have any chest pain. TR. 134. Dr. Ranganathan wrote, "This stress test is inconclusive but it should be noted that patient did not reach the targeted heart rate secondary to fatigue. EKG changes are suggestive of ischemic heart disease. This study needs clinical correlation." TR. 134.

D.   *Reviewing Physicians' Opinions.*

On March 10, 2002, Alan G. Tetlow, M.D., an anesthesiologist, completed a physical RFC assessment based on a review of Johnson's medical records. TR. 126-33. Dr. Tetlow opined that Johnson had the following exertional limitations: (1) occasionally lift no more than 20 pounds; (2) frequently lift no more than 10 pounds; (3) stand or walk about six hours in an eight-hour workday; (4) sit for up to six hours in an eight-hour workday; and (5) unlimited pushing and pulling. TR. 127. Dr. Tetlow further opined that Johnson would have to avoid concentrated exposure to extreme cold, extreme heat, and hazards such as machinery and heights. TR. 130.

On August 1, 2002, a physician whose name is not legible completed a physical RFC assessment based on a review of Johnson's medical records. TR. 146-53. This physician's opinion regarding Johnson's exertional limitations were the same as Dr. Tetlow's, except for a finding that Johnson could only stand or walk for two to four hours in an eight-hour workday. TR. 147. The physician opined that Johnson could only occasionally climb and balance due to right leg pain. TR. 148. In addition, this physician found that the only environmental limitation to which Johnson was subject was avoiding hazards such as machinery and heights. TR. 150.

**IV.    STANDARD OF REVIEW.**

To be entitled to Social Security benefits under SSI, a claimant must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987) (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the

weight of the evidence is against the SSA's decision. *Id.* While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

**V.     ANALYSIS.**

Johnson contends that the ALJ erred by failing to adopt the VE's conclusion that his fatigue would render him unable to perform any available work. He asserts, alternatively, that the hypothetical question posed to the VE was incomplete because it did not include the reviewing physicians' findings of other nonexertional limitations, and that the ALJ did not properly evaluate his pain and other subjective symptoms.  He also submits that the ALJ erred by  failing to order a consultative examination in light of the lack of treatment records in the file.  Finally, he asserts that the ALJ failed to fulfill his duty to consider the combined effect of the impairments.  These are the only issues I will address.

   A.     *Complaints of Pain and Fatigue and Impact on RFC.*

Johnson contends that the ALJ erred by improperly discrediting his complaints of pain and fatigue, which in turn led to an erroneous RFC assessment. The law is clear about the manner in which the ALJ is required to assess complaints of pain and other subjective symptoms.  If proof of a disability is based upon subjective evidence and a credibility determination is critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th

Cir. 1995)(internal quotations omitted).  If the Commissioner discredits the claimant's subjective testimony, "he must articulate explicit and adequate reasons for doing so." *Id.* at 1561-62.

> The appropriate legal standard for evaluating a claimant's subjective complaint of pain is for the [Commissioner] to consider a claimant's subjective testimony of pain if [she] finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition or (2) [that] the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain. *Mason v. Bowen*, 791 F.2d 1460, 1462 (11th Cir. 1986) (citation omitted).

*Walker*, 826 at 1003-04.

In the present case, the ALJ found that Johnson had underlying medical conditions that could reasonably be expected to give rise to the alleged pain and fatigue.  The ALJ articulated the reasons that he found these subjective symptoms not to be disabling.   These reasons included  that Johnson did not complain of chest pain during the treadmill stress test and that he had full range of motion and a normal gait when examined by Dr. Pulwers.[1]  He also acknowledged that Johnson's complaints of fatigue and leg and knee pain were credible to the extent that he would need the ability to shift positions from sitting to standing or walking and vice versa throughout the day.

---

[1] I disregard two other reasons stated by the ALJ.  The ALJ's reliance on Johnson's lack of medical treatment is misplaced because the evidence established that Johnson did not have funds to seek such treatment.  Lack of more aggressive treatment of Johnson's pain may, therefore, be the result of poverty rather than absence of need for such treatment.  *Cf. Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988) (holding that poverty excuses noncompliance with treatment).  I also disregard the ALJ's reliance on Johnson's interest in fishing as indicative that his functional limitations were not as severe as he claimed, because there is no evidence of how long Johnson was able to spend fishing, whether he walked, sat, or stood while doing so, or other indicia that this activity was inconsistent with his claimed limitations.  Because substantial evidence in the record supports other parts of the ALJ's analysis, however, I conclude that the ALJ's reliance on lack of medical treatment and interest in fishing was harmless.

Accordingly, Substantial evidence in the record supports the ALJ's conclusions that the functional limitations arising from Johnson's complaints of pain and fatigue were not as debilitating as he claimed.

      B.    *Other Nonexertional Limitations*.

Both reviewing physicians opined that Johnson should not work around hazards. One of the reviewing physicians opined that Johnson could only occasionally climb and balance, and should avoid work in extreme cold or heat. Johnson contends that the ALJ erred by failing to include these nonexertional limitations in the hypothetical question posed to the VE. He also contends that the ALJ erred by failing to include his testimony about pain arising from stressful situations in the hypothetical question.

The reviewing physician who opined that Johnson could only occasionally climb and balance stated that this assessment was based on problems with Johnson's right leg. TR. 148. The medical records reflected that Johnson had numbness in that leg, but that the problem was resolving. At the hearing, Johnson testified that he only had "[a] little bit" of a problem with his right leg, and he did not describe the extent of that problem. TR. 168. As such, the ALJ was permitted to disregard these postural limitations because they were not supported by substantial evidence in the record.

With respect to environmental limitations, one reviewing physician offered no support for the limitation and the second reviewing physician's notation is illegible. No treating or examining physician opined that Johnson should not work around hazards, or in extreme cold or heat. As

such, the ALJ was also permitted to disregard the environmental limitations because they were not supported by substantial evidence in the record.

Finally, the ALJ adequately addressed Johnson's complaints of pain, as discussed in part A. above. There is no support in the record, other than Johnson's testimony, that stress aggravates his pain. Rather, if Johnson's testimony were credited, he had constant pain despite living an unstressful life. Accordingly, the ALJ also did not err by failing to include a stress-free job in his hypothetical question to the ALJ.

    C.    *Consultative Examination*.

Johnson contends that the ALJ erred by failing to order consultative examinations based on the lack of treatment records in the file. The argument is bewildering because the record shows that the SSA sought two consultative opinions – on from Dr. Pulwers and one from Dr. Ranganathan.

A consultative examination is not required "unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision." *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977). Johnson presents no cogent argument of what gap in the record would have been filled by yet another consultative examination. Accordingly, I find that this argument is unavailing.

    D.    *Combination of Impairments*.

Johnson's last argument is that the ALJ erred by failing to consider his impairments in combination. I note that the ALJ specifically states in his "Findings" that Johnson "has a *combination of impairments* considered 'severe' . . . ." TR. 18. Further, the "Evaluation of the

Evidence" portion of the decision reflects that the ALJ did, in fact, consider the functional limitations arising from all of Johnson's impairments, in combination. The ALJ reviewed all of the evidence in the record. In forming his RFC determination, he specifically noted the limiting effects arising from chest pain, leg and knee pain, and fatigue. This is sufficient to satisfy the ALJ's burden of considering all of Johnson's impairments in combination.

## VI.  CONCLUSION.

For the reasons stated above, it is **ORDERED** that the decision of the SSA is **AFFIRMED**. It is further **ORDERED** that the Clerk of Court shall issue a judgment consistent with this Order and, thereafter, close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 27, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties